AUSA: Cathleen M. Corken     Telephone: (313) 226-9100
Special Agent : Ryan Schanberger     Telephone: (313) 965-6088

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan



United States of America,

        Plaintiff,
v.
Sebastian Gregerson

Case: 2:16-mj-30339
Assigned To : Unassigned
Assign. Date : 8/1/2016
Description: CMP USA v. GREGERSON (SO)

Defendant(s).

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about the date(s) of  July 31, 2016 , in the county of  Monroe  in the  Eastern  District of  Michigan , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 26 U.S.C. Section 5861(d) | Unregistered possession of a destructive device. |
| 18 U.S.C. Section 842(a)(3)(A) | Unlicensed receipt of explosive materials. |

This criminal complaint is based on these facts:
See AFFIDAVIT.

☑ Continued on the attached sheet.

_____
Complainant's signature

Ryan Schanberger, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: AUG 0 1 2016

_____
*Judge's signature*

City and state: Detroit, Michigan

Mona K. Majzoub, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Ryan Schanberger, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1. I have been a Special Agent with the Federal Bureau of Investigation (FBI) since November, 2012. As a Special Agent with the FBI, I am authorized, pursuant to 18 U.S.C. § 3052, to execute search warrants and to make arrests for violations of federal law.

2. Since joining the FBI, I have been assigned to a counterterrorism squad in the FBI's Detroit Division. My duties involve conducting investigations relating to terrorism and other threats to the national security and public safety.

3. This affidavit is in support of a criminal complaint and arrest warrant charging Sebastian Gregerson, aka Abdurrahman Bin Mikaayl, with the unregistered possession of a destructive device, in violation of 26 U.S.C. § 5861(d), and the unlicensed receipt of explosive materials, in violation of 18 U.S.C. § 842(a)(3)(A).

4. The information contained in this affidavit is based on my personal observation and investigation, as well as on reports and information which I received from other law enforcement officers and other individuals related to the

investigation. This affidavit contains information necessary to support probable cause for this application and is not intended to set forth all of the information known by me or the government.

## SUMMARY OF INVESTIGATION

5. Sebastian Zachary Gregerson, aka Abdurrahman bin Mikaayl, is a twenty-nine year old resident of Detroit, Michigan. Gregerson came to the attention of the Detroit FBI in April, 2015, due to reporting from a confidential source who is in a position to have significant knowledge of his activities and whose reporting has been corroborated by independent information. This source alerted the FBI that Gregerson claimed to have in his possession both grenades and bazookas (a shoulder-type rocket launcher).

### Gregerson's Purchases of Weapons, Ammunition, and Tactical Gear

6. During the course of the investigation, agents have obtained records showing that, in the past sixteen months, Gregerson has purchased an arsenal of weapons, ammunition, tactical gear and tactical training materials. Those items include seven fixed blade knives of significant length, hundreds of rounds of AK-47 ammunition, two balaclava ski masks (covering all but the eyes), a car holster, and a Kalashnikov training video.

7. Specifics relating to some of Gregerson's purchases are set forth below:

- **March 26, 2015,** purchase of 700 rounds of 7.62 (AK-47) ammunition;
- **April 23, 2015,** purchase of a car pistol holster used to strap a hand gun to a vehicle seat;
- **April 29, 2015,** purchase of an underground ammunition storage container;
- **April 29, 2015,** purchase of a 9mm/.40 cal magazine case;
- **April 30, 2015,** purchase of a balaclava ski face mask;
- **May 10, 2015,** purchase of a video which is designed to give insight into sensitive tactical movement techniques with firearms that are typically used by law enforcement and military personnel;
- **May 13, 2015,** purchase of a military grade tactical splint used for medical care in combat;
- **May 22, 2015**, purchase of a one-year subscription for online streaming access to a company's tactical, firearms and survival training videos;
- **May 20, 2015,** purchase of a Kalashnikov training video;
- **May 27, 2015,** purchase of a tactical Hissatsu plain fixed knife;
- **May 29, 2015,** purchase of two Hissatsu 7.13-inch fixed blade tactical knives;
- **June 14, 2015,** purchase of a Heiho folding knife;
- **June 21, 2015,** purchase of a Sakimori razor edge tactical knife;
- **June 21, 2015,** purchase of a Shinbu fixed blade knife;
- **July 12, 2015,** purchase of a Hisshou 13-inch fixed blade tactical knife, which the manufacturer describes as "a specialized tool that is intended for military personnel and special forces operators . . .";
- **July 2015,** purchase of a Yukanto tactical fixed blade knife;
- **August 30, 2015,** purchase of a hand gun holster;

- **September 7, 2015**, purchase of a balaclava style head covering;
- **September 26, 2015**, purchase of a tactical pistol belt;
- **October 8, 2015**, purchase of a book describing "deadly skills" to elude pursuers, evade capture and survive dangerous situations;
- **May 22, 2016**, renewal of a one-year subscription for online streaming access to tactical, firearms and survival training videos.

8. Ebay records obtained by law enforcement show that on June 12, 2016, Gregerson purchased Caltrop commercial grade road spikes that are used to slow the advance of, and disable, vehicles.

9. The Hissou, Shinbu, Sakimori, Yukanto, and Hissatsu knives purchased by Gregerson are all long, fixed blade, tactical knives which are not typically carried for every day, recreational use, such as pocket knives. Several of the knives purchased by Gregerson are specifically marketed for tactical, that is, combat, utility.

10. Gregerson has also purchased several tactical training items, corresponding to actual hardware believed to be owned by Gregerson:

- **April 9, 2015,** purchase of two 7-inch orange rubber training hand guns;
- **May 13, 2015,** purchase of a 7-inch rubber training knife;
- **May 13, 2015,** purchase of .357 snap caps (dummy rounds);
- **May 13, 2015,** purchase of 7.62 snap caps (dummy rounds), the same size of round that is used in an AK-47;
- **June 24, 2015,** purchase of an aluminum blade training knife for Hissatsu knives.

In my training and experience, and that of other agents upon whose expertise I am also relying, the purchase of training versions of these weapons makes it unlikely that the weapons were purchased for recreational use, such as hunting.

11. In addition to the above purchases, the investigation has revealed that Gregerson has purchased firearms and related items in recent months. For instance, during the course of FBI physical surveillance on January 5, 2016, investigators observed Gregerson enter a sporting goods store. Once inside, Gregerson was observed looking at what appeared to be assault rifles and ammunition. Records obtained from the store show that Gregerson purchased a paper shooting target used to practice at shooting ranges. On January 28, 2016, an FBI surveillance team observed Gregerson return to the same sporting goods store and again look at rifles.

12. In the past six weeks, Gregerson has purchased three firearms: Kel-Tec Sub 2000 9mm, a second long barreled firearm, and a pistol.

13. On June 13, 2016, and June 15, 2016, a court-authorized method of tracking Gregerson's location indicated that Gregerson had visited an outdoors store in Dearborn, Michigan. On June 16, 2016, investigators traveled to that store. A manager there provided law enforcement with a Firearms Transaction Record for June 13, 2016. That record showed that Gregerson had purchased a Kel-tec Sub 2000 9mm (Gen II) long barreled firearm (e.g. a rifle or shotgun). This weapon is a

semi-automatic rifle with a barrel that folds upward and back, thereby reducing the length of the weapon and making it possible to conceal the fact that it is a long barreled firearm that is within a carrying case.

14. On June 24, 2016, a court-authorized method of tracking Gregerson's location revealed that Gregerson was again located at the same outdoors store in Dearborn, Michigan. During FBI physical surveillance, investigators observed Gregerson depart the store. Approximately one hour later, the National Instant Criminal Background Check System notified the FBI that Gregerson had just applied to purchase a long barreled firearm. The following day, on June 25, 2016, video surveillance of Gregerson's residence showed Gregerson unloading a long and narrow black box from the trunk of his vehicle, which appeared to be the size of a long barreled firearm.

15. On June 29, 2016, an FBI physical surveillance team observed Gregerson purchase a pistol in the parking lot of a gas station in Belleville, Michigan, from a white male.

### Gregerson's Statements To An FBI Undercover Employee About Grenades and Grenade Launchers

16. In recent months, Gregerson has had several lengthy, in-person interactions with an FBI employee operating in an undercover capacity (UCE #1). During

6

those conversations, which were recorded, Gregerson often focused on the subject of weapons, particularly grenade and grenade launchers.

17. During a consensually recorded conversation on May 1, 2016, Gregerson and UCE #1 discussed grenades and grenade launchers. Gregerson told UCE #1 that he possessed a 37mm grenade launcher. There is no *per se* ban on the possession of this type of grenade launcher under federal law. This launcher is used to launch smoke grenades or flashbang grenades. Gregerson described to UCE #1 what tactics he would employ to commit an attack on a building using these types of grenades. Gregerson also told UCE #1 that obtaining "HE" (high explosive) grenades would be illegal and proceeded to explain how he could make homemade grenades of this type with empty 37mm grenade shells. In a subsequent recorded conversation on June 21, 2016, Gregerson stated that he possessed 37mm grenade shells.

18. During the June 21, 2016, consensually recorded conversation, Gregerson and UCE #1 spoke again about the construction of homemade high explosive grenades using hollow shells. During this conversation, Gregerson showed considerable knowledge of the process. Gregerson told UCE #1 that "they're highly illegal, it's a destructive device. You know, and if you built your own you would have to register them as destructive devices before you built them." Gregerson then explained how one could accumulate the various parts to make

7

high explosive grenades, and that it would not be illegal until the parts were assembled to make the device. Gregerson said this could be done quickly and easily. "You know, stuff like that, it's not like it's rocket science you know, so you know. It's really not that complicated, you know."

19. During the same consensually recorded conversation on June 21, 2016, Gregerson and UCE #1 also discussed the topic of grenade launchers, particularly 37mm and 40mm grenade launchers. Gregerson explained that a 40mm grenade launcher is a "destructive device" and, to be legally possessed, must be registered with ATF. At one point, UCE #1 then wondered aloud whether a military grenade launcher called an M203, which is designed to attach to a rifle, could be attached to a civilian assault rifle. Gregerson responded, "oh it's no problem, it's no problem."

20. Gregerson and UCE #1 then discussed devising a code system for talking about this subject matter. Gregerson suggested that they use the term "M80" to describe a 40 (mm) grenade because 80 divided by two is 40. A 40mm grenade is a high explosive grenade.

21. During the consensually recorded conversation on June 21, 2016, UCE #1 indicated that he had a contact who works in a gun shop on a military base. UCE #1 and Gregerson then discussed the possibility of obtaining a 40mm launcher by having the contact put a 40mm launcher in the packaging for a 37mm launcher. Gregerson expressed his interest in obtaining a particular type of 40mm launcher

that could be mounted on a rifle, and acknowledged that it could use 40mm military grenades, and that "it was made for combat." During the conversation, Gregerson also indicated his desire to purchase 40mm grenades or "rounds" for the 40mm launcher. Gregerson concluded, telling UCE #1: "You've got an intel mission here now, tracking down…tracking down some merchandise." I know from UCE #1 that Gregerson was referring to the UCE using his network to obtain a 40mm grenade launcher and 40mm grenades, which Gregerson had previously acknowledged to be destructive devices that would require registration with the ATF.

22. On July 5, 2016, during a consensually recorded conversation, Gregerson asked UCE #1 whether he had "put any more thought into that piece of merchandise," which I know from UCE #1 to be a reference to the 40mm grenade launcher and 40mm grenades Gregerson had expressed interest in obtaining. UCE #1 provided a scenario for obtaining the items, described the necessary participants involved in smuggling this military hardware, and noting that the items would have to be delivered in parts so the military would not detect that they were missing.

23. Gregerson responded that he had been thinking about some of the complications with the plan and the equipment and stated: "I've got another proposal, see what you think of this, what your take is on this," and asked UCE #1: "what do you think would be the possibility of sixty-sevens being easier," noting

9

that there would not be any equipment needed to go along with it. I understand from UCE #1 that Gregerson was referring to M67 fragmentation grenades, which are thrown by hand and do not require a launching device.

24. Gregerson then proposed that UCE #1's source should first provide smoke grenades, which are legal, and then "ease them in to the sixty-sevens." Gregerson told UCE #1: "Find someone who has their hands in the places where both of those things come from," that is, someone who had access to both smoke grenades and M67 grenades. UCE #1 explained that to obtain the M67s, he would need to find either a greedy soldier or a corrupt supply sergeant. When UCE #1 asked Gregerson how many M67 grenades he wanted, Gregerson replied: "I would say if that is an avenue of possibility, start with, let's say five, see where that can go, you know what I mean?" Gregerson suggested paying twenty-five to thirty dollars for each M67 grenade.

25. Three days later, on July 8, 2016, during a consensually recorded conversation, UCE #1 told Gregerson that he "tested the waters" and that the price would be about 75 to 100 dollars per grenade. Gregerson told UCE #1 to "start with some eighteens," which I know from UCE #1 to be a reference to M18 smoke grenades, and then they would see where it goes from there. Gregerson stated: "It's a good way to test the waters."

10

26.     During this same conversation, UCE #1 explained that he knows a friend from his military days who could acquire the grenades. As UCE #1 described the logistics of the purchase, he noted that his contact had referenced the lax accountability for grenades and Claymore mines at the military range. Gregerson responded: "Yeah you know what you just mentioned, that, I almost forgot about those, that's a magical piece of equipment there." UCE #1 and Gregerson then discussed how much more damage Claymore mines can do than grenades. I know from publicly available information that a Claymore mine is an anti-personnel mine that can be detonated remotely. It contains a layer of C-4 explosive behind hundreds of steel balls that are projected outward at a high velocity upon detonation.

27.     During a consensually recorded conversation on July 15, 2016, Gregerson told UCE #1 that he wanted to obtain M67 fragmentation grenades as well as a Claymore mine from UCE #1. Gregerson suggested that he pay $250 for the Claymore mine. Gregerson and UCE #1 further discussed the mechanics of how the deal would occur, with Gregerson conducting counter-surveillance for UCE #1 while UCE #1 retrieved the grenades from his contact on or around a highway in the vicinity of Detroit, Michigan. Gregerson indicated his intent to use a M9 handgun that he owned as payment for these items.

11

28. On the same day, July 15, 2016, Gregerson invited the UCE to his house and texted his address. After UCE #1 arrived, Gregerson showed him a 37mm grenade launcher, 37mm grenades, a loaded AK-47 rifle, a machete, a shotgun shell carrier with 25 rounds, six AK-47 magazines with 40 rounds of ammunition in each, and a ballistics vest with military grade plates. Gregerson also showed UCE #1 a vest with pouches for ammunition. Gregerson told UCE#1 that he had purchased pouches to insert multiple firearm magazines, smoke grenades, and M67 fragmentation grenades. Gregerson also showed a bag to UCE#1 with the six 40-round AK-47 magazines (i.e. 240 rounds), calling it a "grab and go" bag.

29. After Gregerson had shown UCE #1 these materials, UCE #1 noted to Gregerson that he feels like there is a difference between a "rainy day" and "game day." I know from UCE #1 that he was referring to a plan to wait to use the equipment or to a pick a day to use it. UCE #1 indicated to Gregerson that the items Gregerson was showing him constituted "game day" gear, to which Gregerson responded: "Dual use technology." Gregerson further stated: "I don't play around."

30. During a consensually recorded conversation on July 20, 2016, Gregerson and UCE #1 discussed Gregerson's continued desire to first test UCE #1's source with the purchase of smoke grenades before proceeding to obtain the M-67 fragmentary grenades. UCE #1 also told Gregerson that obtaining the Claymore

12

mines would take some time. UCE #1 indicated that he would proceed with making arrangements to obtain the smoke grenades and M-67 fragmentary grenades.

31. On July 27, 2016, UCE #1 explained to Gregerson that the shipment of smoke grenades and the M-67 fragmentary grenades would be coming in on the evening of July 31, 2016, and that the transaction would take place between then and August 1, 2016. In this same conversation, Gregerson discussed with UCE #1 his plans for a full tactical response to law enforcement if they came for him, including the use of grenades.

32. On July 31, 2016, Gregerson and UCE #1 met at a gas station in Monroe, Michigan. A second UCE (UCE #2), whom Gregerson believed to be UCE #1"s associate and a truck driver, was also present. Gregerson arrived at the meeting with the Beretta M9 handgun he previously stated would be used as payment for the M67 fragmentation grenades. UCE #1 then retrieved two smoke grenades from UCE #2, and delivered them to Gregerson, who inspected them. Gregerson was made aware that UCE #2 had in his possession the five M67 fragmentation grenades that Gregerson intended to purchase, and that Gregerson's gun was an acceptable form of payment. Gregerson indicated his desire to UCE #1 to proceed with the deal for the fragmentation grenades. Gregerson gave the handgun to UCE # 1, who again walked to UCE # 2's truck and delivered the gun to UCE #2. UCE

13

#1 left the handgun with UCE #2 and returned to Gregerson's vehicle with a container that included the grenades. UCE #1 delivered the grenades to Gregerson, who was subsequently placed under arrest.

33. In exchange for his firearm, Gregerson received grenade bodies having 6.5 ounces of Composition B high explosive. Composition B is a combination of the high explosives TNT and RDX, as well as grenade fuses, which are destructive devices, as defined by 26 U.S.C. § 5845(f).

34. On July 25, 2016, I requested an explosives licensing check and a destructive devices registration check from the Bureau of Alcohol, Tobacco, Firearms and Explosives with respect to Sebastian Gregerson. A search of the Federal Explosives Licensing System revealed that Gregerson is not licensed to receive explosive materials. A search of the National Firearms Registration and Transfer Record revealed that Gregerson does not have any destructive device, including grenades, registered under his name.

## CONCLUSION

35. Therefore, based on the foregoing, there is probable cause to believe that Sebastian Gregerson, aka Abdurrahman Bin Mikaayl, knowingly possessed a destructive device, in violation of 26 U.S.C. § 5861(d), and knowingly received

explosive materials while not a licensee under the provisions of Chapter 40 of Title 18 of the United States Code, in violation of 18 U.S.C. § 842(a)(3)(A).

_____
RYAN SCHANBERGER
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before
me this 1st day of August, 2016
_____
MONA K. MAJZOUB
United States Magistrate Judge